**MASHCON WHOLESALE DISTRIBUTORS, INC.,**
Appellant,

v.

**A. BENJAMINI & CO., INC., Appellee.**

No. 01–97–00902–CV.

Court of Appeals of Texas,
Houston (1st Dist.).

July 9, 1998.

Harry Herzog, Robert A. Markowitz, Houston, for Appellant.

Tammy Danberg-Farney, Eric G. Carter, Jr., Houston, for Appellee.

Before COHEN, WILSON, and NUCHIA, JJ.

## OPINION

WILSON, Justice.

Appellant, Mashcon Wholesale Distributors, Inc. (Mashcon), appeals a judgment notwithstanding the verdict rendered in favor of appellee, A. Benjamini & Co., Inc. (Benjamini & Co.). We reverse and remand.

### Factual Background

This case arises out of a dispute concerning the present ownership of certain items of formerly consigned jewelry. Mashcon, a wholesale jeweler, is owned and operated by Reuben Goldstein. A large part of Mashcon's business is consigning jewelry to retail jewelry stores. Mashcon frequently placed jewelry on consignment with Suchart's Fine Jewelry (Suchart's), which was operated by Ronald Suchart and Norman Suchart. Mashcon had done business with the Suchart family for over 10 years.

In July of 1995, Mashcon placed several items of jewelry on consignment with Suc-

hart's. Mashcon did not file a consignment lien under the Uniform Commercial Code regarding the consigned merchandise, nor did anyone post a sign on the merchandise in the store indicating that it was on consignment.

Benjamini & Co., a wholesale jeweler and supplier, is owned by Amnon Benjamini. Benjamini had done business with the Suchart family for over 30 years. In addition to directly supplying merchandise to Suchart's, Benjamini & Co. also placed merchandise on a consignment basis in the store. In 1994, Suchart's owed Benjamini & Co. in excess of $1.5 million for inventory it had either purchased directly or received on consignment from Benjamini & Co. In November of 1994, Suchart's executed a $1.5 million promissory note in favor of Benjamini & Co. The note was secured by a security interest in all inventory of Suchart's including after acquired inventory, in favor of Benjamini & Co. A financing statement was recorded and the security interest was perfected.

In July of 1995, Suchart's defaulted on the note, and Benjamini & Co. filed suit and judicially foreclosed its lien on all of Suchart's inventory. Thereafter, a sheriff's sale was conducted and Benjamini & Co. purchased all of the inventory. After the sale, Mashcon discovered that Suchart's inventory had been seized. Mashcon asked for the return of its merchandise, but Benjamini & Co. did not respond.

### Procedural Background

In March of 1996, Mashcon filed suit against Benjamini & Co. and Amnon Benjamini, individually [1] alleging Benjamini & Co. and Amnon converted Mashcon's property. The case was tried to a jury. After both sides rested and closed, the following questions were submitted to the jury and answered by the jury as indicated:

### QUESTION 1

Was SUCHART'S FINE JEWELRY CO. generally known by its creditors to be substantially engaged in the business of selling goods of others?

Answer "Yes" or "No":

Yes

### QUESTION 2

What amount, if any, do you find to be the market value of the jewelry alleged to belong to MASHCON WHOLESALE DISTRIBUTORS, INC.?

"Market value" means the amount that would be paid in cash by a willing buyer who desires to buy, but is not required to buy to a willing seller who desired to sell, but is under no necessity of selling.

Answer in dollars and cents, if any:

ANSWER $26,019.70.

Benjamini & Co. moved for judgment notwithstanding the verdict. The trial court granted the motion and rendered a take-nothing judgment in favor of Benjamini & Co. It is from this judgment which Mashcon now appeals.

### Points of Error

In three points of error, Mashcon argues that (1) the trial court erred and abused its discretion in granting the motion for judgment notwithstanding the verdict because there was some evidence to support the jury's answers; (2) the trial court erred and abused its discretion in disregarding the findings of the jury because there was some evidence to support the jury's answers; and (3) the trial court erred and abused its discretion in ordering that Mashcon take nothing because there was some evidence to support the jury's answers.

### Standard of Review

██ In order to uphold a trial court's judgment notwithstanding the verdict, an appellate court must determine that no evidence supports the jury's findings. *Mancorp, Inc. v. Culpepper*, 802 S.W.2d 226, 227 (Tex.1990); *Cannon v. ICO Tubular Services, Inc.*, 905 S.W.2d 380, 386 (Tex.App.—

---

1. Mashcon nonsuited its claims against Amnon Benjamini, individually, before the case was submitted to the jury.

Houston [1st Dist.] 1995, no writ). When reviewing a no evidence point, an appellate court is limited to reviewing only the evidence tending to support the jury's verdict and must disregard all evidence to the contrary. *Mancorp, Inc.*, 802 S.W.2d at 227–28. If more than a scintilla of evidence supports the jury findings, the jury's verdict must be upheld. *Id.* at 228.

### Discussion

In its motion for judgment notwithstanding the verdict, Benjamini & Co. argued that there was no evidence submitted to the jury: (1) that Suchart's was generally known by its creditors to be substantially engaged in selling the goods of others and (2) that the market value of the jewelry allegedly belonging to Mashcon and in the possession of Suchart's at the time of the Sheriff's sale was $26,019.70.

█ The rights of a consignor are governed by articles 2 and 9 of the Texas Business and Commerce Code. Generally, the agreement of the consignor and seller is not effective against a secured creditor. *Brashear v. D Cross B, Inc.*, 711 S.W.2d 749, 750 (Tex.App.—Fort Worth 1986, writ ref'd n.r.e.). However, a supplier of goods on consignment may protect his goods from the claims of creditors if he meets with one of the four exceptions set out under section 2.326 of the Texas Business and Commerce Code. *See Brashear*, 711 S.W.2d at 750. Section 2.326 provides:

Sale on Approval and Sale or Return; Consignment Sales and Rights of Creditors

(a) Unless otherwise agreed, if delivered goods may be returned by the buyer even though they conform to the contract, the transaction is

(1) a "sale on approval" if the goods are delivered primarily for use, and

(2) a "sale or return" if the goods are delivered primarily for resale.

(b) Except as provided in Subsection (c), goods held on approval are not subject to the claims of the buyer's creditors until acceptance; goods held on sale or return are subject to such claims while in the buyer's possession.

(c) Where goods are delivered to a person for sale and such person maintains a place of business at which he deals in goods of the kind involved, under a name other than the name of the person making delivery, then with respect to claims of creditors of the person conducting the business the goods are deemed to be on sale or return. The provisions of this subsection are applicable even though an agreement purports to reserve title to the person making delivery until payment or resale or uses such words as "on consignment" or "on memorandum." *However, this subsection is not applicable if the person making delivery*

(1) complies with an applicable law providing for a consignor's interest or the like to be evidenced by a sign, or

(2) *establishes that the person conducting the business is generally known by his creditors to be substantially engaged in selling the goods of others, or*

(3) complies with the filing provisions of the chapter on Secured Transactions (Chapter 9), or

(4) is delivering a work of art subject to the Artists' Consignment Act.

(d) Any "or return" term of a contract for sale is to be treated as a separate contract for sale within the statute of frauds section of this chapter (Section 2.201) and as contradicting the sale aspect of the contract within the provisions of this chapter on parol or extrinsic evidence (Section 2.202).

TEX. BUS. & COM.CODE ANN. § 2.326 (Vernon 1994) (emphasis added).

█ At trial, it was undisputed that Mashcon did not comply with the filing provisions of the Texas Business and Commerce Code, did not give written notice to anyone that it was consigning goods to Suchart's, and did not have a sign on its goods posted at Suchart's to indicate a consignment. Therefore, pursuant to section 2.326(c)(2), Mashcon's claim to its consigned merchandise is subordinate to Benjamini & Co.'s perfected securi-

ty interest in the inventory unless Mashcon can show that Suchart's was generally known by its creditors to be substantially engaged in selling the goods of others.[2]

### The Evidence

At trial, Goldstein testified that the consignment of merchandise in the jewelry business is a very common practice. Goldstein stated he was generally aware that: (1) Suchart's had consigned merchandise belonging to others; (2) Suchart's "operated on a great portion of their inventory that was consigned;" (3) "quite a few jewelry suppliers in the industry" have consigned jewelry to Suchart's; (4) "[i]t was quite known in the industry that they [Suchart's] do operate on a lot of borrowed or consigned merchandise;" and (5) Benjamini & Co. had a substantial quantity of jewelry on consignment at Suchart's. Goldstein testified, however, that he could not recall the exact names of Suchart's creditors, but he knew throughout the years that "quite a few suppliers here in Houston" had given Suchart's merchandise on consignment.

Goldstein testified that when he became aware the Sucharts had lost their store, he had $26,709.09 worth of merchandise on consignment there. Goldstein stated he based this amount on standard wholesale prices in the industry. In addition, a list concerning the items consigned to Suchart's was also introduced into evidence which contained the value of the items and indicated if the item had been sold.[3]

Ronald Suchart testified that Suchart's regularly engaged in the business of selling consigned merchandise and that it was the general practice in the trade that most jewelers "get things on consignment." Suchart stated that creditors in the jewelry business generally were aware of this practice. Suchart testified that a number of companies, including Benjamini & Co., were consignors of Suchart's, and just prior to signing the note with Benjamini & Co., Suchart's had a "great deal of consigned merchandise belonging to Mr. Benjamini" in the store. Suchart

additionally testified that on average, Suchart's held approximately 25 percent of its inventory on a consignment basis. On cross-examination concerning the amount of consigned merchandise in 1995, Suchart testified to the following:

Q. You had a million dollars worth of Mr. Benjamini's—— million dollars of inventory that your company owned in the store in 1995?

A. Yes, sir.

Q. You had some consigned merchandise in your store?

A. In addition to the million dollars worth.

Q. Now that million dollars that was in your store, that was money that was owed to Mr. Benjamini?

A. Yes.

Q. You had sold—— well, strike that. Through 1995 how much consigned merchandise did you have, if you know?

A. In 1995?

Q. Yes.

A. I'm just estimating, maybe $400,000. I don't know the exact figure.

Q. Is that the total amount the whole year in and out?

A. Yea, it was in and out. It was always——

Q. So at any given time you may have $150,000 or $200,000 worth of consigned merchandise?

A. Probably more.

Q. 200?

A. Three to four hundred thousand.

Q. At any given time?

A. Uh-huh.

Suchart stated he could not remember if he told Amnon Benjamini that some of his inventory was consigned by Mashcon. On cross-examination, in discussing which creditors knew Suchart's was in the business of

---

2. The parties do not dispute that the applicable provision is TEX. BUS. & COM.CODE ANN. § 2.326(c)(2) (Vernon 1994).

3. Although Goldstein testified that the value of the merchandise he had on consignment at Suchart's was $26,709.09, the jury found the value to be $26,019.70.

carrying consigned merchandise, Suchart testified:

Q. How many of all your creditors have you— if you can tell the jury, how many of them knew that you were in the business of having some consignment merchandise in your store?

A. How many of them knew directly?

Q. Knew directly.

A. I don't know that I ever discussed that with anybody. I never discussed one with another.

Q. It would be bad business; wouldn't it?

A. Well, I think it would be bad business.

Suchart testified that he could not dispute the value given by Goldstein concerning the jewelry he had on consignment with Suchart's.

Norman Suchart testified that at any given time Suchart's carried between 10 and 15 percent of its total inventory as consignment merchandise. In regards to the relationship Suchart's had with Benjamini & Co., Norman stated:

Q. You know about the relationship with Mr. Benjamini and your brother?

A. Yes.

Q. Did your company conceal from Mr. Benjamini the fact that it was engaged in some consignment arrangements with other vendors?

A. You say did we hide it from him. I don't think we made an issue about of it one way or the other.

Q. Well, did you tell him? Did your company tell him?

A. I didn't.

Q. You never did?

A. Not to my knowledge or recollection.

Q. Did you tell any of your creditors that you had consignment merchandise in your store?

A. Did not make an issue of it, no. Didn't hide it, but didn't make an issue.

. . .

Q. Well, did the creditors of the store generally know or would they have known from you— would they have known that you were selling consignment merchandise?

A. They may have. They may have not. I mean, it wasn't anything said about this was consignment and this was not consignment. Anything in the store was run in together. There was no way anyone would know this was consignment and this was not consignment except for the employee.

Amnon Benjamini testified that Suchart never told him that he was "getting merchandise from someone else." Benjamini stated that when he consigned merchandise to Suchart's, he was unaware that the store had other consigned merchandise. Benjamini additionally stated that Suchart told him that he was the only supplier of merchandise:

Q. Did you think you were the only supplier of merchandise?

A. Supposedly what he told me when we do the business. I trust him. He said, "Benjamini, give me the credit. I'm going to do all the business with you." He never told me because he was scared. Also Mr. Goldstein did a memo. He's my friend. He did business behind me. I never know he has memo. He never told me. Mr. Suchart told you he never told me he was doing business with others.

Q. So you thought he was going to do business with you exclusively?

A. Right. That's why I was giving him credit. I signed my life to him. I give credit to nobody. I never have another customer like this. I thought he was only doing the business for me.

█ In reviewing only the evidence tending to support the jury's verdict, disregarding all evidence to the contrary, and considering only the inferences that tend to support the verdict, the evidence indicates that (1) Suchart's was generally know in the industry and by its creditors as substantially engaged in selling consigned merchandise; (2) anywhere between 10 and 25 percent of Suchart's business was on consignment; (3) Suchart's largest creditor, Benjamini & Co., had a substantial amount of merchandise consigned to Suchart's; and

(4) Mashcon had $26,709.70 worth of consigned merchandise remaining at Suchart's in July 1995. Based on the above, we conclude that there is more than a scintilla of evidence to support the jury findings as to questions one and two.[4]

We sustain points of error one, two, and three.

### Cross–Points

In cross-points one and two, Benjamini & Co. argues that there was factually insufficient evidence to support the jury's answer to questions one and two. *See* Tex.R. Civ. P. 324(c).

 In reviewing a factual sufficiency point, we examine all the evidence and will set aside the verdict only if the evidence is so weak or the finding is so against the great weight and preponderance of the evidence that it is clearly wrong and unjust. *Cain v. Bain*, 709 S.W.2d 175, 176 (Tex.1986); *Hollander v. Capon*, 853 S.W.2d 723, 726 (Tex. App.—Houston [1st Dist.] 1993, writ denied). Additionally, a jury is free to believe or disbelieve all or any part of the evidence in making its finding. *See McGalliard v. Kuhlmann*, 722 S.W.2d 694, 697 (Tex.1986).

 Although the record contains some conflicting testimony concerning the percentage of consignment business done by Suchart's, and which creditors knew about the consignment business, the jury's finding that Suchart's was generally known by its creditors to be substantially engaged in the business of selling goods of others is not so contrary to the great weight and preponderance of the evidence as to be clearly wrong and unjust. In addition, the evidence concerning the market value of the jewelry belonging to Mashcon was undisputed. We therefore conclude the jury finding that the market value of the jewelry was $26,019.70 was not so contrary to the great weight and preponderance of the evidence as to be clearly wrong and unjust.

### Conclusion

In sustaining points of error one, two, and three and overruling cross-points one and two, we hold that the trial court erred in rendering the judgment notwithstanding the verdict.

We, therefore, reverse the judgment and remand the cause with instructions to the trial court to render judgment for Mashcon in the amount of $26,019.70 in accordance with the jury verdict and to calculate prejudgment and postjudgment interest and add it to the $26,019.70.

---

4. In support of their position, Benjamini & Co. partially relies on *In re Arthur A. Everts Co.*, 35 B.R. 706 (Bankr.N.D.Tex.1984). One of the issues in *Everts* was whether the debtor conducting his jewelry business was generally known by his creditors to be substantially engaged in the selling the goods of others under U.C.C. 2.326(c)(2). The court in *Everts* first noted that of the approximate $690,000 in inventory shown on the debtor's schedules, approximately $75,000 thereof was on consignment. In addressing this fact, the court stated:

> If the test under the U.C.C. 2.326(c)(2) is whether the debtor was known to be engaged in *primarily* selling the goods of others (as set forth in the U.C.C. official comment), then the undisputed facts show that the debtor was not primarily engaged in selling the goods of others. The plain wording of U.C.C. 2.326(c)(2) appears to indicate that "substantially engaged in selling the goods of others" is not limited to one "primarily" engaged in selling the goods of others as suggested by the official comment of the permanent U.C.C. editorial board.

*Id.* at 709 (citations omitted). The court then briefly reviewed the evidence concerning the creditors' knowledge. The court found the evidence inconclusive stating that the plaintiffs "failed to prove by a preponderance of the evidence that the debtor 'generally' (with respect to the larger part, or most part, of its creditors) was known to be substantially engaged in selling the goods of others, if it was." *Id.*

*Everts* is distinguishable from the present case because of the differing procedural postures and the resulting standards of review. In addition, the evidence concerning the percentage of consigned merchandise in the present case is greater than in *Everts*.